**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 97-60547

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JAVIER FIGUEROA,

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Mississippi
(1:96-CR-50-BrG)

November 5, 1998

Before REYNALDO GARZA, STEWART and PARKER, Circuit Judges.

PER CURIAM:[*]

Javier Figueroa appeals his convictions for conspiracy to import cocaine into the United States and aiding and abetting the importation of cocaine. We affirm.

PROCEDURAL HISTORY

Figueroa was indicted with three other persons for conspiracy to import cocaine from Costa Rica into the United States and aiding

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

and abetting the importation of cocaine. One of his codefendants, Martin Navarro, pleaded guilty prior to trial and testified for the Government; a second, Alfren Quintero, was discharged after the Government rested its case at trial; and the third, Mery Cardenas, Figueroa's companion when he was arrested, was dismissed after the jury was unable to reach a verdict in her case.

Figueroa filed a pretrial motion to suppress evidence seized from his person at the time of his arrest, that is, a sheet of facsimile ("fax") paper containing incriminating information. The motion also sought to suppress a written confession he made to law enforcement agents after his arrest. Following an evidentiary hearing, the lower court denied the motion.

Figueroa was convicted on both counts and sentenced to 121 months imprisonment and five years supervised release on each count to run concurrently.

FACTS

On Saturday, September 14, 1996, United States Customs agents stationed in Gulfport, Mississippi, received information that a Forest Line motor vessel carrying cocaine was due to arrive at the Port of Pascagoula, Mississippi, on Monday, September 16, 1996. The agents were informed that the cocaine would be under the control of two crew members, "Marvin" and "Albert," and that the community of Gautier, Mississippi, and two local stores, K-Mart and Hudson's, had some part in the plan.

A Forest Line motor vessel named the Forest Link was in fact due to arrive in Pascagoula from Costa Rica on September 16, 1996.

2

The ship was two days late, but it finally arrived in Pascagoula at 5:30 a.m. on Wednesday, September 18, 1996. Customs agents boarded the ship almost immediately and obtained a crew list. Martin Navarro and Alfren Quintero, who the agents believed might be the "Martin" and "Albert" referred to in their intelligence, were on board the ship. Shortly thereafter, agents conducted a border search of the ship and discovered twenty kilograms of cocaine, as well as evidence linking Navarro and Quintero to the drugs.

Modesta McNeil, a security guard at the port, testified that on September 16, 1996, the date the ship was originally scheduled to dock in Pascagoula, Figueroa and codefendant Mery Cardenas drove up to the guard shack. Figueroa got out of the car and inquired about the Forest Link. She told him the ship had not arrived, and he asked for a telephone number that he could call to find out if the ship had come in. McNeil wrote down the guard shack telephone number on a slip of paper and gave it to Figueroa. McNeil testified that Figueroa had a Spanish accent and that she received numerous phone calls from a man with a Spanish accent inquiring about the Forest Link. The calls were unusual in that in the 15 or 16 years she had worked there, she had never received so many calls in one day inquiring about a ship.

Angela Durden, another port security guard, also testified at trial. Durden was on duty on September 18, 1996, the day that the Forest Link arrived and was searched by the agents. On that day, Cardenas came to the port in a car driven by a man who looked like defendant Figueroa. They parked down the street instead of driving

3

up to the guard shack.  Cardenas got out of the car and asked if she could get someone (who Durden understood was Cardenas' husband) off the ship.  Figueroa drove up and spoke to Cardenas in a language other than English.  Cardenas then wrote "Samanta" and an 800 phone number on a slip of paper and asked the guard to give it to "Marvin" and to let Marvin know that she had already made two trips to the port and that she could not keep coming back to the ship.  Durden wrote "Marvin" on the bottom of the paper and wrote Figueroa's license plate number on the back as he drove away from the shack.  She also made a note on the log sheet with the names "Doris, Marvin and Alfred," based on her conversation with Cardenas and turned it over to the custom agents.

The custom agents had learned earlier in the day that a Hispanic male and/or female in a vehicle like Figueroa's had inquired about the ship on the day it was scheduled to arrive; they also knew that the female had been asking for a crew member named Marvin, claiming he was her husband.  While Figueroa and Cardenas were at the guard shack talking to Durden, the agents noticed Figueroa's vehicle and followed it when it left.  As the agents followed the vehicle in four unmarked cars, it abruptly pulled into a gas station, turned around and headed in the opposite direction. Figueroa then drove into a hospital parking lot, where he got out, walked to the door of the hospital, stopped, and went back to his vehicle.  He then left the parking lot, drove a short distance, turned around, went back to the parking lot and parked.  The agents pulled their cars in next to Figueroa's and approached him.

4

Figueroa got out of his car and walked toward the agents, acting "very excited and aggressive." Mery Cardenas also got out of the car. Figueroa was asked to put his hands on the hood of the car to calm him down and to allow the agents to get the situation under control. He was patted down for weapons, but none were found. An agent asked Figueroa for his identification and he replied that his driver's license was in "that pocket." Based on Figueroa's hand movements, Agent Brown understood that the license was in his back left pocket. Brown reached into that pocket and removed a "handful of papers, cards," including Figueroa's driver's license.

Unsolicited by the agent, Figueroa explained that he was on vacation, going from New York to Texas. The agent asked him what he was doing in the Pascagoula area. He replied that he was there to see the big ships, that he sent the lady accompanying him to the guard shack to get permission to go in and see the big ships and that he had a camera in his vehicle to take pictures of them. Brown believed Figueroa was lying to him, because he had information that Cardenas had inquired at the guard shack about a crew member with the same name as the suspected drug smuggler, rather than asking for tourist information about the ships as Figueroa claimed. Cardenas made a separate statement to the agents that essentially tracked Figueroa's vacation story. Figueroa and Cardenas both gave consent for the agents to search their vehicle. During the search they discovered a handwritten note with the words "guard shack" and two Pascagoula phone numbers.

They also discovered motel receipts in the name of Jorge Estrada. Agent Brown testified that at that point, he believed his original reasonable suspicion had ripened into probable cause to believe that Figueroa was involved in the scheme to import cocaine. During the resulting search, which Agent Brown conducted prior to and incident to the arrest, he discovered the fax in Figueroa's right front pocket.

After telling Figueroa that he believed that Figueroa was involved with the cocaine discovered on the ship, Agent Brown placed Figueroa under arrest and gave him *Miranda* warnings. Figueroa began crying and gave a statement admitting that he had been offered $20,000 to pick up the drugs and take them to New Jersey, although he thought the package would contain marijuana rather than cocaine. Figueroa later gave an inculpatory statement in writing at the Customs Office after being advised of his rights again.

## MOTION TO SUPPRESS

Figueroa moved to suppress the fax found in his pocket as well as his subsequent oral and written statements. On appeal, he challenges the district court's denial of that motion. "We review findings of fact rendered after a suppression hearing for clear error and conclusions of law *de novo*. We view the evidence in the light most favorable to the party that prevailed -- the Government here -- and consider both evidence offered at the suppression hearing and admitted at trial." *United States v. Munoz*, 150 F.3d 401, 411 (5th Cir. 1998)(citations omitted).

The district court set out its reasons for denial orally in the record. The district court held that the fax was seized in a valid search incident to arrest and that probable cause existed for that arrest. Further, the district court held that the statements Figueroa gave subsequent to the arrest and *Miranda* warnings were voluntary, and not the product of coercion, threats or promises.

We must determine whether the agents exceeded the permissible parameters of the original stop, whether probable cause for arrest had developed at the time Agent Brown reached into Figueroa's pocket and retrieved the fax and whether that retrieval was within the bounds of a search incident to arrest.

The agents had the following information at the time of the stop: cocaine had been found on board the Forest Link; a Hispanic man and woman had inquired several times about the arrival of the vessel; the woman had informed port security that she was trying to contact her husband aboard the vessel, who she identified by the same name as one of the suspects; Figueroa and Cardenas matched the description of the Hispanic man and woman he parked his vehicle an unusual distance from the security shack on the day of his arrest while Cardenas talked to the guard and he drove evasively when followed by unmarked police cars.

During the stop, it developed that Cardenas had used at least three different names (Doris, Samanta and Mery) and that Figueroa had registered in a hotel under the name Estrada. Further, they told the agents they were sightseeing on vacation, contradicting the story that Cardenas had told port security about attempting to

contact her husband. The identity of Figueroa and Cardenas as the Hispanic individuals who had been making inquiry earlier at the port was confirmed by the slip of paper with "guard shack" telephone numbers on it. At this point, the agents' reasonable suspicion was strengthened into probable cause. *See United States v. Espinoza-Seanez*, 862 F.2d 526, 533 (5th Cir. 1988)(fact that defendant lied to agent, was nervous and sweating profusely, combined with reasonable suspicion the agents already had, strengthened that suspicion into probable cause).

The fact that the formal arrest followed the search which yielded the fax does not prevent it from being incident to the arrest, so long as the fruits of the search incident to the arrest are unnecessary to support probable cause for the arrest. *Rawlings v. Kentucky*, 448 U.S. 98, 111, n.6 (1980). Here, the fax was not necessary to provide the agents probable cause to arrest Figueroa. We therefore agree with the district court that the challenged search was a valid search incident to arrest.

On appeal, Figueroa does not dispute that the agents had reasonable suspicion to support a *Terry* stop, or that asking for identification, questions about destination and a patdown for weapons were a legitimate part of such a stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). Rather, Figueroa contends that the agent exceeded the limits of a *Terry* stop when he reached into Figueroa's pocket and retrieved the papers containing the driver's license and that the subsequent discovery of the fax in Figueroa's front pocket was the "fruit of the illegal search" which had previously yielded

8

the driver's license.  We reject this argument.  In response to the agent's request for identification, Figueroa answered, "My driver's license is in that pocket."  His words were accompanied by a gesture indicating which pocket it was in and acquiescence in the officer's retrieval of the license.  Assuming the agent's actions can be correctly characterized as a warrantless search of Figueroa's pocket for a driver's license, it was reasonable under all the facts and circumstances, for the officer to believe that he had Figueroa's consent for such a limited search.  *See United States v. Jaras*, 86 F.3d 383 (5th Cir. 1996)(considering the objective reasonableness of the officer's belief concerning the scope of the search to which the defendant consented in determining the constitutionality of a warrantless search).

Moreover, it is not clear that finding the fax was the "fruit" of the officer's retrieval of the driver's license.  The license was valid, confirmed the information Figueroa had given the agents concerning his identity and did not contribute to the probable cause which eventually resulted in his arrest.

Finally, Figueroa has pointed to nothing in the record and we find nothing to indicate that the agents exceeded limits of time or scope imposed by our jurisprudence on an investigative stop.

We therefore affirm the district court's denial of Figueroa's motion to suppress.

## SUFFICIENCY OF THE EVIDENCE

Figueroa contends that the evidence was insufficient to support either count of conviction.  We find these points of error

9

to be without merit.

## CONCLUSION

For the foregoing reasons, we AFFIRM Figueroa's convictions.